DANIELLE  WALKER,                          )
                                           )
                    Plaintiff,             )
                                           )
          vs.                              )          1:13-cv-00402-SEB-DML
                                           )
UNITED PARCEL SERVICE,                     )
                                           )
                    Defendant.             )

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment

[Docket No. 39], filed on April 11, 2014.  Plaintiff Danielle Walker, proceeding *pro se*,

brings this claim against her current employer, the United Parcel Service, Inc. ("UPS),

alleging that UPS failed to accommodate her disability, in violation of the Americans

with Disabilities Act ("ADA").  For the reasons detailed below, we <u>GRANT</u> Defendant's

Motion for Summary Judgment.

## Factual Background

**General Background**

UPS is engaged in the business of transporting and delivering packages across the

world.  UPS operates the following three facilities in the Indianapolis, Indiana, area: the

81st Street and 16th Street "hub" facilities, and the Castleton package center.

In August or September 2007, Ms. Walker was hired by UPS to work at the 81st

Street facility as a part-time package loader/unloader.  During all relevant times of her

employment with UPS, Ms. Walker worked solely at the 81st Street facility and only in part-time positions. As a part-time employee, Ms. Walker worked about twenty-five hours per week, loading customer packages from an automated belt onto outgoing UPS trailers and unloading packages from incoming trailers to an automated belt. Depending upon the season, she was at times allowed to work overtime hours.

As a loader/unloader at UPS, Ms. Walker was a member of the Teamsters Local 135 Union and the terms of her employment were governed by the Local 135 Rider Supplement to the National Master United Parcel Service Agreement and Central Region Supplemental Agreement (hereinafter the "CBA"). According to UPS, Ms. Walker remains an employee of the company but is out on a medical leave of absence.[1]

Customer packages processed at the 81st Street facility are divided into three categories: "small sort," "regular" or "standard," and "bulk" packages. Small sort packages are smaller in size, typically equivalent to a shoe box or letter size, and can weigh no more than 8 pounds each. Regular or standard packages weigh between 9 and 70 pounds, and are larger in size than small sort packages. Bulk packages weigh between 70 and 150 pounds, or are unusually large in size. Loaders/unloaders are required to handle all three of these categories of packages.

**Plaintiff's April 2010 Injury**

On April 13, 2010, Ms. Walker had surgery to repair the anterior cruciate ligament ("ACL") in her right knee. The cause of Ms. Walker's knee injury and the resulting

---

[1] Although Ms. Walker contends that she is no longer entitled to a leave of absence under the terms of the CBA, there is no evidence in the record establishing that UPS has terminated her.

surgery was not work related.  Ms. Walker was seen by Dr. Thomas Trainer who opined that she could return to work on July 12, 2010 with the restriction of lifting no more than 8 pounds.  Ms. Walker contends that on July 12, 2010, she returned to work and showed Dr. Trainer's report to UPS Manager Carmen Edwards.  According to Ms. Walker, Mr. Edwards told her that she could not return to work with restrictions because her injury was not work-related and that she would need to return to her treating physician to get the restrictions removed before she could come back to work at UPS.  Ms. Walker contends that she did so and then returned to Mr. Edwards, who told her that she would need to see a UPS treating physician before returning to work.  According to Ms. Walker, after visiting the physician required by UPS, she returned to work on July 18, 2010 in the position of sorter[2] (another position at UPS).

UPS, however, contends that she did not return to work without restrictions until September 17, 2010.  According to UPS, when Ms. Walker returned to work after the surgery, she performed a job assignment for approximately one month (from September to October 2010) that she described as "jam-breaker."  This assignment required Ms. Walker to stand next to an automated belt carrying small sort packages and to break apart groups of packages that were jammed together, by leaning over the belt and physically manipulating those packages.  The "jam-breaker" position also entailed lifting off of an automated belt standard sized customer packages that had mistakenly been sorted in with the small sort packages.  Finally, the "jam-breaker" assignment required Ms. Walker to

---

[2] In her deposition testimony, however, Ms. Walker stated on a number of occasions that she had never performed the job of sorter at UPS.

place empty canvas bags on bin racks located next to the automated belt carrying small sort packages, into which other employees would then place small sort packages. According to Ms. Walker, approximately twenty-five percent of her time as a "jam-breaker" was spent moving improperly sorted packages and hanging the canvas bags on racks.

In November 2010, Ms. Walker requested that UPS move her back to her loading/unloading position because the "jam-breaker" assignment was more difficult than loading packages. Outside of the one month she spent as a "jam-breaker," Ms. Walker performed the loading/unloading position at all other times relevant to this litigation.

**Plaintiff's December 2010 Injury and Temporary Alternative Work Assignment**

Eight months after her first injury, on December 14, 2010, Ms. Walker again injured her knee while performing her loader/unloader job. Ms. Walker received immediate treatment and was issued a return to work note that same day with the following restrictions: "[m]ust use crutches 100% of the time" and "[s]hould be sitting 100% of the time" with "no climbing stairs or ladders" and no lifting, standing, or walking. Dkt. No. 48-2 at 19. A worker's compensation claim arising from her December 2010 injury was subsequently submitted on Ms. Walker's behalf.

The CBA that governs Ms. Walker's employment provides that UPS may at its discretion assign an employee who is temporarily unable to perform the essential functions of her position because of an injury to a temporary alternative work assignment ("TAW") involving "light duty" tasks for a limited time period, typically around thirty days. TAW tasks are not permanent positions but rather are "designed to provide

4

temporary work opportunity to those employees who are unable to perform their normal work assignments due to an on-the-job injury" as they recover.  Exh. 1 to Walker Dep. Pursuant to the CBA, UPS "maintains the right to determine the availability and designation of all TAW assignments."  *Id.*

Following Ms. Walker's December 14, 2010 injury, UPS provided her with a TAW assignment at the 81st Street facility between January 4, 2011 and February 17, 2011, a period of approximately seven weeks.  During this time, Ms. Walker was paid for approximately 75 hours and was occasionally assigned to perform miscellaneous administrative or "light duty" tasks.  For example, for two of the days Ms. Walker was on TAW status, she was asked to fold t-shirts that are given as prizes to UPS employees who earn incentive points in their jobs.  Ms. Walker also was asked to study for and to take two routine safety tests while she was on TAW status.  Additionally, for one day, Ms. Walker was assigned to work in UPS's small sort area.  Ms. Walker was given a chair and a cart, placed next to a belt with numerous standard size packages that had been improperly placed in the small sort area, and asked to move the packages off the belt and onto the cart.  According to Ms. Walker, the packages weighed between ten and fifteen pounds.  She was only able to perform this task for one or two hours before stopping due to pain and being "very uncomfortable" sitting in the chair.  UPS did not ask Ms. Walker to perform this task again.  UPS also offered Ms. Walker the opportunity to use work time while she was on TAW status to study for and take a written test that would qualify her to become a "sorter," but she declined to do so.

Because the purpose of the TAW assignments is to provide work for employees temporarily unable to perform their assigned jobs while they recover from workplace injuries, UPS rarely allows employees to remain on TAW status for more than eight weeks. According to UPS, in February 2011, the company's risk management group learned that Ms. Walker's doctors were recommending that she have another surgery on her right knee, which would necessitate a longer recovery time.[3] Smith Decl. ¶ 10. Because Ms. Walker had at that point already been on TAW status for a number of weeks, UPS ended her TAW assignment on February 16, 2011, after seven weeks, and placed her on a medical leave of absence at that time. Ms. Walker, however, contends that in February 2011 her doctors were still not certain that she would require surgery. Dkt. No. 48-2 at 34-35.

**Plaintiff's Work Restrictions in 2011 and Early 2012**

On March 1, 2011, UPS sent Ms. Walker to Dr. Scott Lintner for treatment. Dr. Lintner determined that surgery was necessary and, on April 11, 2011, Ms. Walker underwent an ACL reconstruction surgery on her right knee. Throughout the remainder of 2011, Ms. Walker continued to receive treatment, including physical therapy on her right knee. While Ms. Walker was on a medical leave of absence, she was eligible for a weekly income replacement benefit through worker's compensation insurance as long as she continued to receive treatment and continued to recover from her injury.

---

[3] Ms. Walker contends that on February 11, 2011, her chosen physician, Dr. Jonathan Shook, told her that he could not continue to treat her because she had not been sent to him by her employer.

UPS uses Liberty Mutual Insurance to provide worker's compensation insurance and to administer worker's compensation claims. Liberty Mutual representatives communicated frequently with Ms. Walker and the health care professionals providing her treatment to discuss her medical status, medical expenses, medications, physical therapy treatments, and the status of her benefits. UPS's Risk Management department, located at the company's corporate offices in Louisville, Kentucky, coordinated directly with Liberty Mutual to assist in managing Ms. Walker's worker's compensation claim. UPS operations personnel from the 81st Street facility also periodically communicated with Ms. Walker in 2011 and 2012 to discuss her ongoing treatment progress and return to work status. According to Ms. Walker, Liberty Mutual faxed her doctors' notes to UPS each time she received treatment in order to keep UPS updated on her condition.

Prior to April 2012, Ms. Walker never communicated to anyone at UPS her desire to return to work. Rather, throughout 2011 and at least through January 2012, Ms. Walker consistently told UPS operations personnel that she was receiving treatment for her injury and that neither she nor her doctors anticipated her return to work. During this same time period, Ms. Walker's treating physician, Dr. Lintner, repeatedly communicated to Ms. Walker and to Liberty Mutual representatives that she should continue to receive physical therapy and treatment for her right knee injury, and that her work status remained "sit down work" only. This information was in turn communicated to UPS by Liberty Mutual representatives.

**Plaintiff's Request for Independent Medical Examination**

In late January 2012, Liberty Mutual determined that it was likely that Ms. Walker had reached maximum medical improvement ("MMI") on her right knee, based on its review of her medical history and treatment progress since suffering the injury, despite her treating health care provider not yet having made that determination. MMI is a term used in the worker's compensation context to describe the point at which the patient will no longer gain benefit or improve functionality with further treatment or physical therapy. Based on its determination that Ms. Walker had reached MMI, on February 27, 2012, Liberty Mutual sent Ms. Walker for an independent medical evaluation with Dr. Louis Angelicchio. Upon evaluation, Dr. Angelicchio opined that Ms. Walker had, indeed, reached MMI.

Ms. Walker disagreed with Dr. Angelicchio's conclusion and believed that her right knee function could still improve if she received more physical therapy. Ms. Walker asked the Indiana Worker's Compensation Board to schedule another independent medical examination with a different doctor for a second opinion regarding whether she would continue to benefit from further physical therapy, and, if not, to define her work restrictions. UPS's risk management group was notified in March 2012 that Ms. Walker had made this request.

On April 10, 2012, Ms. Walker consulted with Dr. Lintner to discuss the upcoming independent medical examination. Consistent with restrictions he had previously assigned her, Dr. Linter opined that Ms. Walker's work status remained "[m]odified duty work, see restrictions," which he described as "[s]it-down work only"

and "may prop up leg." Exh. 9 to Walker Dep. In her deposition, Ms. Walker conceded that this was an accurate description of her physical restrictions on that date and that, as of that time, she was unable to perform any work that required lifting or standing.

Also on April 10, 2012, Ms. Walker's attorney sent a letter to the Indiana Worker's Compensation Board and Liberty Mutual expressing Ms. Walker's opinion that further physical therapy would improve her condition. UPS's risk management group also received a copy of this letter on or around that same date. On April 24, 2012, the Indiana Worker's Compensation Board sent a letter to Dr. Norman Mindrebo requesting that he address the following issues at his upcoming independent medical examination of Ms. Walker: "What is Ms. Walker's current diagnosis and condition of her right knee injury sustained at work? … Would she be able to return to work with specific limitations? … What are such limitations?" A copy of this letter was sent that same day to UPS's worker's compensation attorney, Paul Fields, who in turn forwarded it to UPS's risk management personnel shortly thereafter.

**Plaintiff's Request to Return to Work**

On April 25, 2012, Ms. Walker went to the UPS 81st Street facility in person to discuss returning to work. At that point, Ms. Walker had not yet had her independent medical examination with Dr. Mindrebo, which was scheduled for May 24, 2012. When she arrived at the UPS facility, Ms. Walker spoke with UPS Manager Carmen Edwards for approximately five minutes. Ms. Walker gave Mr. Edwards a copy of Dr. Linter's April 10, 2012 note and stated that she wanted to return to work, but that her doctor had

released her to perform sit-down work only. According to Ms. Walker, Mr. Edwards told her that she could not return to work because the restrictions contained in Dr. Lintner's April 10 note were not permanent restrictions. He further stated that he had to call another UPS employee named "Todd" and "another lady" whose name she cannot remember to "see what he [could] do about it." Walker Dep. at 160. Ms. Walker provided her telephone number to Mr. Edwards so that he could contact her once he had more information. Ms. Walker did not tell anyone from UPS that she was scheduled for another independent medical examination in May.

Following his conversation with Ms. Walker, Mr. Edwards sent an email to Pete Hood, UPS's Regional Health and Safety Manager, inquiring as to Ms. Walker's current medical status and what follow up should be done. Mr. Hood, in turn, asked Cindy Price in UPS's risk management department for information regarding Mr. Walker's current medical status. Around May 1, 2012, Ms. Price notified Mr. Hood that Ms. Walker was scheduled for the independent medical examination with Dr. Mindrebo on May 24, 2012, and that Ms. Walker's medical status and work restrictions remained unclear pending that examination. Ms. Price accordingly advised Mr. Hood to wait for the independent medical examination to be completed before further considering Ms. Walker's request to return to work.

On May 1, 2012, when she had not heard from Mr. Edwards, Ms. Walker sent UPS a letter she had written on April 25, 2012, explaining that she had been released to return to "sit down work only" but that she had not yet heard from UPS and was

requesting help to return to work and to receive her workman's compensation payment. Dkt. No. 48-3 at 6. She contends that UPS never responded to that letter. On May 18, 2012, Ms. Walker sent a follow-up email to her Union representative, Jeff Combs, explaining her situation and requesting his assistance, but received only an automated response acknowledging receipt of her email and instructing her that someone would contact her soon. Dkt. No. 48-3 at 9.

**Plaintiff's Independent Medical Examination and Subsequent EEOC Charge**

On May 24, 2012, Dr. Mindrebo examined Ms. Walker. During that examination, Ms. Walker reported that she was unable to return to her job as a loader/unloader at UPS "because of the pain she ha[d] with activities of daily living. For example, when she first gets up out of [a] chair, she has knee pain. If she climbs or descends stairs, she has knee pain. Any twisting or turning produce[s] knee pain in the medial compartment of her knee." Dkt. No. 41-16 at 73. Upon examination, Dr. Mindrebo determined that Ms. Walker had reached MMI and recommended no further treatment for her. He also opined that she was "limit[ed] [in] her ability to perform her job[] as a loader/unloader and, as an orthopedic surgeon, I would recommend that she find other work to prevent further damage to her knee." *Id.* at 74. Dr. Mindrebo's report did not contain any information regarding the nature of Ms. Walker's specific permanent restrictions. UPS risk management personnel received Dr. Mindrebo's report on June 7, 2012.

Five days after her visit to Dr. Mindrebo, on May 29, 2012, having received no response to the letter she sent to UPS on May 1st and the email she sent to Mr. Combs on

11

May 18th, Ms. Walker filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination in violation of the ADA. Tab A, Exh. A.

**Plaintiff's Permanent Work Restrictions and Initiation of Interactive Process**

Ms. Walker was next examined by Dr. Lintner on June 12, 2012. Dr. Lintner opined that Ms. Walker's permanent restrictions included no lifting over 25 pounds and no pushing or pulling greater than 250 pounds. UPS risk management personnel received notification of Dr. Lintner's report that same day. Upon receipt, Ms. Price sent an email to Mr. Hood and UPS District Human Resources Manager Jim Lewis notifying them of the permanent restrictions and informing them that she had referred Ms. Walker to UPS's Human Resources Services Center ("HRSC") to initiate UPS's ADA process.

On June 13, 2012, UPS occupational health supervisor Donna Luessen sent Ms. Walker a letter inviting her to call a toll-free number should she desire an accommodation for her restrictions. This letter was sent to Ms. Walker via UPS Ground mail at 7194 Warrior Trail, Apartment 424, Indianapolis, Indiana, 46260, the address at which Ms. Walker was living at the time she began her medical leave of absence in February 2011. UPS's Global Employee Management System ("GEMS"), which UPS uses to maintain records related to the home addresses of UPS employees and which UPS's human resources department references for the most complete and updated employee records, also identified 7194 Warrior Trail as Ms. Walker's then-current address. The record shows that the letter was delivered to 7194 Warrior Trail on June 15, 2012 at 2:32 p.m., with the delivery driver noting, "met customer woman." Exh. C to Leussen Decl.

12

Although Ms. Walker did not respond to the June 13, 2012 letter, UPS initiated its internal ADA interactive process on Ms. Walker's behalf and sent her a letter on June 28, 2012, asking for her physician to provide more detailed information regarding her permanent work restrictions and the manner in which those restrictions impacted her ability to work at UPS (hereinafter "ADA questionnaire). The ADA questionnaire was sent to Ms. Walker at the Warrior Trail address and was delivered on July 2, 2012. When Ms. Walker failed to respond to the ADA questionnaire, UPS sent her a letter dated July 12, 2012, which was delivered to the Warrior Trail address on July 16, 2012, reminding her to provide the requested information or to call UPS's toll-free number if she needed assistance collecting that information.

On September 26, 2012, UPS learned from a representative from the EEOC that Ms. Walker had moved to a different address.[4] Human Resources Manager Shayla Gardner updated Ms. Walker's address in the GEMS system to 915 Belhaven Drive, Apartment 2, Indianapolis, Indiana, 46229, after receiving the new address from the EEOC investigator. The next day, September 27, 2012, UPS sent Ms. Walker another ADA questionnaire to the Belhaven address, which Ms. Walker received.

On October 15, 2012, Dr. Lintner completed the ADA questionnaire on Ms. Walker's behalf. Dr. Lintner referenced the same restrictions for Ms. Walker that he

---

[4] UPS employees are responsible for notifying human resources of changes in address. According to UPS, Ms. Walker did not notify the company of any change to her address at any time in 2012. Ms. Walker, however, contends that when she moved on April 8, 2011, she provided Charles White, her worker's compensation lawyer at the time, with her new address so that he could pass on that information to UPS's worker's compensation attorney, Paul Field.

opined were necessary on June 12, 2012, to wit, "no lifting over 25 pounds" and "no push-pull over 250 pounds." Exh. 17 to Walker Dep. In her deposition, Ms. Walker testified that those restrictions were accurate as of June 12, 2012, and currently remain accurate. According to Ms. Walker's testimony, in 2012 she was still experiencing pain standing, walking, or climbing stairs, and was unsure as to whether she could stand for a prolonged period of time. She further testified that she did not believe she could perform the amount of walking she was required to do in her loader/unloader job without "significant pain" and that whether she could walk across a room without pain "depended on the day," but that she could not believe she could climb a set of stairs without pain or climb stairs multiple times during a 3.5 hour shift. Walker Dep. at 181-82, 184-87.

UPS Area Human Resources Manager Shayla Gardner sent Ms. Walker a letter on October 31, 2012 at the Bellhaven Drive address in an attempt to schedule a meeting on November 6, 2012 among herself, Ms. Walker, and a representative from UPS's occupational health group to discuss her request for an accommodation and to gather more information on her current medical status and work restrictions. Ms. Walker did not attend the November 6th meeting, and instead sent Ms. Gardner and Donna Luessen (the UPS occupational health representative) emails that day, stating that she refused to meet with UPS and that any communications with her should go through the EEOC investigator assigned to her charge. Ms. Walker concedes that EEOC investigator Lynda Parker informed her that UPS wanted to discuss her accommodation request and that she

refused to meet with UPS unless the company agreed to pay her for "back pay" first. Walker Dep. at 292-93, 298-99.

On November 12, 2012, Ms. Gardner sent Ms. Walker a second letter, this time attempting to schedule a meeting on November 28, 2012 to discuss Walker's request for an accommodation. Ms. Walker again did not attend the meeting. On December 17, 2012, Ms. Gardner sent Ms. Walker a letter notifying her that UPS was considering her to have withdrawn her request for an accommodation under the ADA, based on her failure to attend the November 6th and November 28th meetings, and that she could reinstitute her request at any time by contacting the human resources department. Ms. Walker disputes that she was told by UPS that she could renew her accommodation request, but it is undisputed that as of the date of this entry, she has not attempted to do so.

**Essential Job Functions of Relevant UPS Positions**

Loader/unloaders are responsible for loading and unloading all three categories or weight classes of packages. Thus, an individual performing this job is frequently required to lift and carry packages weighing up to 70 pounds and more infrequently assist in moving bulk packages weighing up to 150 pounds. Loader/unloaders are also required to stand for the entire shift and frequently walk and climb up and down ladders. The job requirements for this position are the same regardless of the area of the 81st Street facility in which the employee works. Loader/unloaders are expected to work at a rate of 1,000 to 1,200 packages per hour while unloading, and 300 to 500 packages per hour while loading. Ms. Walker concedes that she was unable to perform the essential job functions

15

of the loader/unloader position and that she is unaware of any accommodations that UPS could have provided her that would have allowed her to perform those essential functions. Instead, Ms. Walker contends that UPS should have offered her an alternative position that fit within her restrictions as an accommodation for her disability.

According to UPS, during the relevant time period, to wit, April 1, 2012 through December 17, 2012, there were only two regular part-time positions (other than the loader/unloader position) open at the three Indianapolis facilities available to Ms. Walker: (1) preloader; and (2) sorter.

Similar to the loader/unloader position, a preloader at UPS is required to load packages in all three categories of UPS customer packages. The essential job functions therefore require lifting and carrying packages weight between 50 and 70 pounds; assisting in moving packages up to 150 pounds; standing, walking, climbing stairs and ladders, bending, and squatting; and lifting, lowering, and carrying packages at rats of 200 to 400 packages per hour.

The sorter position at UPS requires an employee to stand at the automatic belt and "sort" customer packages by maneuvering, lifting, or otherwise moving them so that they can be scanned for delivery information, and then maneuvering, lifting, or otherwise moving them to a different belt or container, depending on the package's destination zip code and size. Sorters may be assigned to work in UPS's "primary" package processing operation or in the "small sort" area. Regardless of the area to which they are assigned, sorters are required to be able to sort packages while in a standing position for their entire

shift; bend, stoop, climb, crouch, squat, walk, and turn/pivot while sorting packages; and occasionally climb ladders and stairs. Sorters assigned to work in the "primary" package processing operation at the 86th Street facility are required to lift all sizes of customer packages, including those weighing between 50 and 70 pounds. Sorters assigned to the small sort area are assigned to scan small sort packages that are moving past them on the automated belt system, and then must maneuver the scanned packages into the appropriate bin rack based on the package's destination zip code. Once the canvas bag on a bin rack is full of sorted packages, it can weigh up to 70 pounds, and the sorter must frequently lift and carry the full canvas bags to other areas throughout their shift. Employees are also required to pass a test to establish whether they can sort packages by zip code before they can work as sorters.

**The Instant Litigation**

After receiving her dismissal and notice of rights letter from the EEOC, Ms. Walker timely filed her *pro se* complaint on March 11, 2013, alleging that UPS violated the ADA by failing to provide a reasonable accommodation for her disability. On April 11, 2014, UPS filed its motion for summary judgment, which is now fully briefed and ready for ruling.

<u>**Legal Analysis**</u>

**I.      Standard of Review**

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.* at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th

Cir. 1994). Thus, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enter., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

## II.     Discussion

In order to survive summary judgment on her claim that UPS failed to accommodate her disability, Ms. Walker must show that: (1) she is a "qualified individual with a disability"; (2) UPS was aware of her disability; and (3) UPS failed to reasonably accommodate her disability. *Gratzl v. Office of Chief Judges*, 601 F.3d 674, 678 (7th Cir. 2010). UPS does not dispute that it was aware of Ms. Walker's disability. Accordingly, we focus our analysis on the first and third elements, to wit, whether Ms. Walker was a qualified individual with a disability and, if so, whether UPS failed to reasonably accommodate her disability in violation of the ADA. We address these issues in turn below.

### A.     Qualified Individual with a Disability

To survive summary judgment on her failure to accommodate claim, Ms. Walker must first demonstrate that she is a qualified individual with a disability. For purposes of

this motion, UPS apparently concedes that Ms. Walker is "disabled" within the meaning of the ADA. Thus, the only issue in dispute is whether Ms. Walker has made the predicate showing that she was a "qualified individual" under the statute, to wit, that she "satisfies the pre-requisites for the position" and "can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001) (quoting *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996)). Here, UPS claims that Ms. Walker has failed to make this showing because the undisputed evidence establishes that she could not perform the essential job functions of the loader/unloader position she held before her injury, and further, that she was not qualified for any other open position available at the company during the relevant time period.

In her deposition testimony, Ms. Walker conceded that after the knee injury she suffered at work, she was unable to perform the essential job functions of her prior position at UPS loading and unloading packages, and further, that she was not aware of any accommodations that UPS could have provided her that would have allowed her to perform them. Despite these clear admissions in her deposition testimony, in her briefing in opposition to UPS's motion for summary judgment, Ms. Walker changed her position, arguing that while it is true that she could not perform the essential functions of the loader/unloader job without accommodation, she could have performed those duties with the accommodation that she be limited to loading and unloading only small sort packages, all of which weigh less than 8 pounds. According to Ms. Walker, this accommodation would allow her to perform the position because, even with her

permanent restrictions, she was able to lift up to 25 pounds and push/pull up to 150 pounds.

In determining whether a particular task is an essential job function, "a court may consider, but is not limited to, evidence of the employer's judgment of a position, written job descriptions prepared before advertising or interviewing applicants for the job, the work experience of past incumbents of the job, and the work experience of current incumbents in similar jobs." *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2001) (citing 29 C.F.R. § 1630.2(n)(3)). Here, Ms. Walker has admitted that, as a loader/unloader, she was responsible for frequently lifting and carrying packages weighing up to 70 pounds and at times was required to assist in moving bulk packages weighing up to 150 pounds. On the record before us, there can be, indeed, there is no dispute that these were essential job functions of the position of loader/unloader. Thus, limiting Ms. Walker to small sort loading and unloading would require UPS to permanently assign to other employees essential functions of the unloading/loading job and would result in the restructuring not just of Ms. Walker's job, but the jobs of other employees as well as they would be required to take on the extra duties that Ms. Walker was excused from performing.

This is not a reasonable accommodation under the ADA. Although the ADA "provide[s] disabled persons an opportunity to work assuming accommodations exist which allow them to perform a job as would any other employee," *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 867 (7th Cir. 2005), it does not require an employer "to give [a] disabled employee preferential treatment, as by … waving his normal

requirements for the job in question." *Williams v. United Ins. Co. of Am.*, 253 F.3d 280, 282 (7th Cir. 2001) (citations omitted). It is well-established under Seventh Circuit law that "strip[ping] a current job of its principal duties" is not a reasonable accommodation. *Gratzl*, 601 F.3d at 680. Accordingly, Ms. Walker has failed to demonstrate that allowing her to load and unload packages solely in the small sort area constitutes a reasonable accommodation.

Alternatively, Ms. Walker argues that UPS should have reassigned her to an alternate position for which she was qualified and could perform. It is true that "the ADA may require an employer to reassign a disabled employee to a different position as reasonable accommodation where the employee can no longer perform the essential functions of their current position." *Gile v. United Airlines, Inc.*, 95 F.3d 492, 498 (7th Cir. 1996). This rule has "significant limitations," however. *Id.* at 499. The ADA requires an employer to reassign a disabled employee only to a position that is vacant and for which the employee is otherwise qualified. *Jackson v. City of Chicago*, 414 F.3d 806, 813 (7th Cir. 2005). An employer is not required to create a "new position" for the disabled employee or to convert a temporary "light duty" job into a permanent position in order to accommodate the employee. *Gratzl*, 601 F.3d at 680; *Rehling v. City of Chicago*, 207 F.3d 1009, 1015 (7th Cir. 2000) (collecting cases).

Ms. Walker has identified the following positions to which she contends she could and should have been reassigned: (1) "folding t-shirts for the UPS store"; (2) "bag racking"; (3) customer service telephone clerk; (4) package operations clerk (a position which Ms. Walker refers to as "handling mis-sorted packages"); and (5) a sorter assigned

solely to the small sort area.[5]  UPS identified a preloader position as one additional job that was vacant and open to Ms. Walker in 2012.  However, for the following reasons, the undisputed evidence establishes that these positions were either not permanent, were not vacant in 2012, or required heavy lifting that Ms. Walker was unable to perform.

The first two positions to which Ms. Walker suggests she should have been reassigned – t-shirt folding and "bag racking" – are not permanent positions that exist for UPS employees.  As Ms. Walker testified, the only knowledge she has of an employee folding t-shirts while working at UPS comes from her own assignment to do this task during one or two days of her TAW assignment after the first time she injured her knee. She concedes that she does not believe that UPS has a permanent position such as this. Similarly, Ms. Walker's only knowledge of "bag racking" (hanging empty canvas bags on racks) stems from the fact that this was one discrete task among many she performed as during her brief assignment as a "jam breaker."  Seventh Circuit law is clear that merely identifying a temporary position that the employee held in the past is insufficient to establish the existence of a reasonable accommodation as an employer has no obligation under the ADA to transform a temporary, light duty position into a permanent job for a disabled employee.  *See Gratzl*, 601 F.3d at 680; *Rehling*, 207 F.3d at 1015

---

[5] In her response brief, Ms. Walker identified the following two additional positions to which she contends she could and should have been reassigned, but which she failed to identify either in discovery or at her deposition: (1) "address corrections" and (2) "next day air origin scanner." However, because Ms. Walker has failed to identify any admissible evidence to establish that these positions existed at UPS and were vacant in 2012, or any information regarding the applicable job functions or physical requirements and her ability to perform them, the mere mention of these job titles is insufficient to raise any genuine issue of material fact that would preclude summary judgment.

("Occasional opportunities to work in another department are not equivalent to a vacancy for a permanent position."). Because folding t-shirts and "bag racking" are not permanent positions but rather merely portions of temporary assignments, Ms. Walker cannot meet her burden by establishing she could perform these tasks.

Ms. Walker has failed to identify any admissible evidence to establish that either the customer service telephone clerk or the package operations clerk positions were vacant during the relevant time period. Mere speculation is unsufficient. *See Shaw v. GDX North Am.*, 3:05-CV-094RM, 2007 WL 433072, at *7 (N.D. Ind. Feb. 2, 2007) (holding that the plaintiff failed to carry her burden on failure to accommodate claim because she failed to identify a vacant position open to her, where her assertion that such a position existed was based solely on speculative testimony). On the other hand, UPS has presented evidence establishing that the company has not hired any new customer service telephone clerks at any facility in the Indianapolis area since 2010, nor has any individual been transferred or moved into the position, and that no part-time package operations clerk positions were open or available at any of UPS's Indianapolis facilities during 2012.[6] Hood Decl. ¶¶ 16, 20. Because Ms. Walker has not identified any contradictory evidence showing that vacancies in these positions existed in 2012, we

---

[6] Even if a package operations clerk position had been open in 2012, Ms. Walker would not have been able to perform that job with or without a reasonable accommodation. Just as with the loader/unloader position, the operations clerk position requires regular lifting of packages weighing between 50 and 70 pounds, assisting in moving packages weighing up to 150 pounds, and frequent standing, walking, stooping, bending, crouching, turning, and pivoting throughout the work day. The only accommodation Ms. Walker suggests is that UPS allow her to perform the job sitting down and to assign her solely to the small sort area. For the same reasons discussed with reference to the loader/unloader position, these are not reasonable accommodations.

cannot conclude that reassignment as a customer service telephone clerk or package operations clerk was an accommodation that UPS could have offered.

The final two positions to which Ms. Walker potentially could have been reassigned in 2012 are the sorter and preloader positions. However, the essential job functions for both the sorter and preloader positions include identical requirements as the loader/unloader position, to wit, regular lifting of packages between 50 and 70 pounds, as well as frequent standing, bending, squatting, walking, and occasional climbing of stairs and ladders.[7] For the same reasons detailed above with reference to the loader/unloader position, Ms. Walker cannot show that she could perform either the sorter or preloader position with or without reasonable accommodation.

Because Ms. Walker has failed to prove that she could perform the essential job functions of the loader/unloader position she held before her injury or that she was qualified for any other open position available at the company during the relevant time period, she has failed to establish that she is a qualified individual with a disability entitled to ADA protection.

## B.   Failure to Accommodate

Given that Ms. Walker has failed to establish that she is a qualified individual within the meaning of the ADA, we need not address the sufficiency of UPS's interactive process. *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013) (holding

---

[7] Sorters are also required to pass a test on properly sorting packages by zip code before being eligible to work in the position. Ms. Walker concedes that she has never taken or passed this test, and thus, she cannot show that she was otherwise qualified for the position.

that breakdown in the interactive process "is actionable only if it prevents identification of an appropriate accommodation for a qualified individual"). However, even if Ms. Walker could establish that she is a qualified individual with a disability, her failure to accommodate claim would nonetheless fail because it is clear that UPS fulfilled its obligations under the ADA by properly addressing her request for an accommodation.

Once an employee requests an accommodation because of a disability, "the employer must engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *Kauffman v. Petersen Health Care VII, LLC*, 769 F.3d 958, 963 (7th Cir. 2014) (citation omitted). The interactive process is designed to allow the employer and employee to "identify the employee's precise limitations and discuss accommodation which might enable the employee to continue working." *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1178 (7th Cir. 2013) (quotation marks and citation omitted). If the process fails to result in a reasonable accommodation of the disabled employee's limitations, "responsibility will lie with the party that caused the breakdown." *Id.* (quotation marks and citation omitted).

Here, Ms. Walker first requested an accommodation on April 25, 2012, when she visited the 86th Street facility and spoke with Mr. Edwards about returning for work. At that point, her physician had released her for sit-down work only. Ms. Walker had also requested a second independent medical examination (which was scheduled for May 24, 2012) to address whether further therapy would be beneficial for her right knee, and if not, to determine her permanent restrictions. After Ms. Walker requested an accommodation, Mr. Edwards contacted UPS Human Resources Manager Pete Hood,

who in turn contacted UPS risk management representative Cindy Price for information regarding Ms. Walker's current medical status.  At that point, Ms. Price notified Mr. Hood of Ms. Walker's upcoming independent medical examination.  Because Ms. Walker's medical restrictions at that point remained unclear, UPS decided to wait for the independent medical examination to be completed before further considering Ms. Walker's accommodation request.  The EEOC approved such an approach under comparable circumstances in *Summers v. Potter*, EEOC DOC 01994641, 2002 WL 1367546, at *5 n.2 (EEOC June 12, 2002).

Once UPS received Ms. Walker's permanent restrictions, it immediately attempted to initiate the interactive process by sending her a letter requesting information regarding the manner in which those restrictions might impact her ability to work at UPS.  Although this request for information was initially sent to the wrong address, even taking the facts in the light most favorable to Ms. Walker as we are required to do at this stage in the litigation that was at most a good faith mistake on the part of UPS.  As soon as it was made aware of Ms. Walker's updated address, the company immediately sent a copy of the information request to the new address and also subsequently attempted to schedule two different meetings with Ms. Walker to discuss her accommodation request.  These communications were sufficient to satisfy UPS's obligation to engage Ms. Walker in the interactive process as required by the ADA.

Ms. Walker, however, conditioned her agreement to meet with UPS until the company agreed to honor its "settlement" and pay her an undisclosed amount of "back pay."  While it is unclear exactly what "settlement" Ms. Walker believes she had reached

with UPS or what entitlement she had to back pay, there is no evidence before us that any such agreement or entitlement actually existed. Under the ADA, *both* parties have a duty to actively participate in the interactive process and "courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary." *See Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). There decidedly was a breakdown in the interactive process in this case entirely caused by Ms. Walker's failure to meet with UPS to discuss her accommodation request. Accordingly, Ms. Walker is unable to establish that UPS denied her a reasonable accommodation by failing to engage in the interactive process.

## III.   Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED. Final judgment shall issue accordingly.

IT IS SO ORDERED.


Date:   2/20/2015

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:


DANIELLE  WALKER
Holy Family Center
907 N. Homes Ave.
Indianapolis, IN 46222

Ellen Girard Georgiadis
QUARLES & BRADY LLP
ellen.georgiadis@quarles.com

Jeffrey S. Piell
QUARLES & BRADY LLP
jeffrey.piell@quarles.com

Andrew F. Hettinga
QUARLES & BRADY, LLP
andrew.hettinga@quarles.com